**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARLO SIMPSON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18CV1088 PLC |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Carlo Simpson, Jr. seeks review of the decision of Defendant Commissioner of Social Security, Andrew Saul, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. For the reasons set forth below, the Court affirms Defendant's denial of Plaintiff's applications.

**I.      Background and Procedural History**

On March 17, 2015, Plaintiff, then forty-six years old, filed applications for Disability Insurance Benefits and Supplemental Security Income alleging that he was disabled as of June 1, 2011 due to:  HIV, neuropathy in feet and hands, fatigue, depression, joint pain, lack of energy and motivation, low self-esteem, and inability to stand for a very long time.  (Tr. 11, 73-74)  The

_____

[1] At the time this case was filed, Nancy A. Berryhill was the Deputy Commissioner of Operations of Social Security. Andrew M. Saul became the Commissioner of Social Security on June 4, 2019. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party.  Fed. R. Civ. P. 25(d).  Later proceedings should be in the substituted party's name and the Court may order substitution at any time.  Id. The Court will order the Clerk of Court to substitute Andrew M. Saul for Nancy A. Berryhill in this matter.

SSA denied the claim on September 21, 2015, and Plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ). (Tr. 82, 91-93) The SSA granted Plaintiff's request for review and conducted a hearing on May 19, 2017, at which Plaintiff and a vocational expert appeared and testified. (Tr. 47-72)

In a decision issued on June 19, 2017, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from March 17, 2015, the date the application was filed." (Tr. 21) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on May 10, 2018. (Tr. 1-7, 147) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence before the ALJ

### A. Hearing

At the administrative hearing in May 2017, Plaintiff testified that he was forty-eight years old. (Tr. 53-54) Plaintiff had a high school education and worked as a dishwasher at a restaurant until June 2011, when he became sick with "the flu and pneumonia." (Tr. 54) Plaintiff testified that he had been homeless since March 2015. (Tr. 53)

Plaintiff testified that his most serious impairment was HIV. (Tr. 55) His symptoms included lack of energy, dizziness, fatigue, depression, migraines, and numbness and burning in his fingers and toes. (Tr. 54, 63) Plaintiff stated that, as a result of the "neuropathy and nerve damage" in his feet, "I can't even walk a block without having to stop. . . . everything's like in slow motion." (Tr. 56) Plaintiff testified that, when his fingers were not numb, he suffered a burning sensation, which "fe[lt] like liquid acid or something" and occurred two to three times

per week for "two or three hours maybe." (Tr. 57-58) Plaintiff experienced migraines "every day" and they lasted "two or three hours." (Tr. 63)

When his hands were not "burning," Plaintiff was able to dress himself, tie his shoes, put on a belt, and eat with utensils. (Tr. 57-59) When Plaintiff was "moving from house to house," he would "occasionally…take out the trash, something like that." (Tr. 64) Plaintiff affirmed that when he was "in these homes," he also prepared meals and did laundry. (Id.)

Plaintiff estimated that he had lost "about 40 pounds" since March 2015. (Tr. 66) Plaintiff believed his impairments affected his ability to "stick with things and concentrate" and he had "troubles [sic] speaking." (Id.) He did not believe he could resume working as a dishwasher because "of my endurance and my speed. . . . Like I say I move real slow now. If I overexert myself, I almost black out." (Id.)

A vocational expert testified at the hearing. (Tr. 67, 228) She explained that Plaintiff's previous work as a dishwasher was "unskilled" and required "medium exertion." (Tr. 68) The ALJ asked the vocational expert to consider a hypothetical individual who:

> [c]ould perform at the light exertion level; [can] occasionally climb ramps and stairs, [but not] ladders, ropes, or scaffolds…could engage in frequent handling and fingering;…limited to performing simple, routine tasks, but not at a fast pace; could have occasional interaction with coworkers and the public. No concentrated exposure to extreme heat, cold, dust, fumes, or other pulmonary irritant.

(Tr. 68-69) The vocational expert testified that such an individual could not perform Plaintiff's past work, but could perform "light, unskilled" jobs available within the national economy such as a merchandise marker or a collator operator. Id. When the ALJ modified the hypothetical to "no interaction with the public and now at sedentary level," the vocational expert opined that such an individual could work as an addressing clerk or document preparer. (Tr. 70-71)

B.  Relevant Medical Records[2]

Plaintiff established care with Dr. Summers, his primary care physician, in August 2014. (Tr. 233)  Plaintiff informed Dr. Summers that he was first diagnosed with HIV in 1993 and had "not taken medicine or had labs in several years, as he has been homeless."  (Tr. 245)  Plaintiff was 5'10" tall and weighed 122.4 pounds, and he complained of significant weight loss, worsening fatigue, thrush, and "a persistent right jaw abscess."  Id.  Plaintiff denied depression, dizziness, and bone/joint pain. (Tr. 234-35)  Upon examination, Dr. Summers noted that Plaintiff was "emaciated" with "shoddy anterior cervical, axillary and inguinal lymphadenopathy, oral thrush, right mandibular abscess, and firm palpable mass in the inferior pole of right testicle." (Tr. 246)  Dr. Summers prescribed fluconazole, Bactrim, and Amoxil.  (Tr. 245)

Plaintiff returned to Dr. Summers' office two weeks later.  (Tr. 250)  Plaintiff had gained eight pounds and his oral thrush and jaw abscess had resolved.  (Id.)  Plaintiff denied fatigue, dizziness, headaches, and bone/joint pain.  (Tr. 248)  Dr. Summers noted:  "At [Plaintiff's] last visit, he was found to have a viral load of 378,000[3] and a CD4 cell count of less than 20.[4]  He was started on Bactrim and presents now to start on antiretrovirals."  (Tr. 250).  Dr. Summers observed that Plaintiff "appears intoxicated," advised against smoking, and recommended

---

[2] Plaintiff does not appeal the ALJ's mental RFC finding.  As a result, the records pertaining to Plaintiff's mental health are not relevant and will not be included in this decision.

[3] "Serial measurement of HIV viral load is a standard procedure to monitor the course of AIDS." Johnson v. Astrue, 4:10-CV-2364-LMB, 2012 WL 886883, at *4 n.5 (E.D. Mo. March 15, 2012) (citing Stedman's Medical Dictionary, 1113 (28th ed. 2006).  An undetectable viral load is the goal of antiviral therapy.  See Grace v. Hakala, 1:11-CV-81-LMB, 2014 WL 790786, at *1 (E.D. Mo. Feb. 26, 2014)

[4] "Tracking the infected individual's CD4+ cell count is one of the most accurate measures of the course of the disease."  Bragdon v. Abbott, 524 U.S. 624, 634 (1998) (citations omitted).  "A normal CD4 count in a healthy individual ranges from 500 to 1,600.  "Individuals with HIV who have CD4 counts over 500 are usually in good health. Individuals with HIV who have CD4 counts below 200 are considered to have AIDS and are at significant risk of developing serious illnesses."  Grace v. Wallace, 1:16-CV-70-SNLJ, 2017 WL 5730501, at *2 (E.D.Mo. Nov. 28, 2017).

outpatient treatment for alcohol and drug abuse.  (Id.)  Plaintiff's neurological examination and examination of his extremities were normal.  (Tr. 251)

At Plaintiff's follow-up appointment with Dr. Summers in September 2014, his weight had decreased to 121 pounds and his review of systems was positive for decreased appetite, weight loss, heartburn, fatigue, thrush, and lymphadenopathy.  (Tr. 253)  In regard to the medications, Plaintiff reported "100% compliance with no side effects." (Tr. 255)  At his next appointment, in November 2014, Plaintiff's weight had increased to 144 pounds, and he denied fatigue, dizziness, and bone/joint pain.  (Tr. 258)

When Plaintiff saw Dr. Summers in January 2015, Plaintiff complained of back and knee pain, weight loss, and thrush.  (Tr. 260)  Dr. Summers noted:  "At last visit, [Plaintiff's] CD4 cell count remained less than 20 and his viral load had decreased from 377 to 135.  He reports good compliance with medication since that time."  (Tr. 260)  Plaintiff denied "any significant health problems" and his neurological examination and examination of his extremities were normal. (Tr. 262, 264)  Dr. Summers recommended tobacco cessation.  (Tr. 264)

At his follow-up appointment with Dr. Summers in April 2015, Plaintiff complained of peripheral neuropathy.  (Tr. 266)  Dr. Summers noted:  "His last viral load went from 135 down to 25 and CD4 cell count went from less than 20 up to 21. His last creatinine was 1.38.  He's been struggling with housing and diet and has lost 12 pounds.  His only other complaint is of worsening peripheral neuropathy in the hands and feet."  (Id.)  Plaintiff's review of systems was positive for weight loss, and Dr. Summers observed that Plaintiff appeared thin with lipoatrophy. (Tr. 266)  Dr. Summers continued Plaintiff's medication and added gabapentin.  (Tr. 266)

When Plaintiff returned to Dr. Summers' office in July 2015, Plaintiff reported "worsening heartburn" and that the gabapentin "has helped slightly with his peripheral

neuropathy, but [he] is interested in increasing the dosage." (Tr. 278) Plaintiff's last viral load was undetectable, his "CD4 cell count increased from 21 up to 108," his last creatinine level was 1.38, and his weight was 135.4 pounds. (Tr. 278) Dr. Summers increased Plaintiff's gabapentin. (Id.)

At Plaintiff's follow-up appointment with Dr. Summers in October 2015, Plaintiff complained of depression, "general sense of weakness," and "inability to gain weight." (Tr. 320) Dr. Summers noted: "He has been compliant with medication; his last viral load was undetectable and CD4+ cell count increased from 108 to 216." (Id.) Dr. Summers prescribed Phenergan for nausea, mirtazapine for depression and appetite, and continued Plaintiff's Prilosec for stomach pain. (Id.)

In January 2016, Dr. Summers noted that Plaintiff "was advised to return after one month, but has returned after 3 months." (Tr. 318) Plaintiff's depression was "better, though not perfect" and his weight had increased twelve pounds. (Tr. 318) Dr. Summers noted that Plaintiff was "compliant with medications, without side effects," and Plaintiff's "last viral load was undetectable, CD4 cell count 289…and creatinine 1.56." (Id.) Dr. Summers discontinued Plaintiff's Bactrim "as his CD4 cell count is persistently elevated" and "strongly advised on tobacco cessation." (Id.) Plaintiff's neurological examination and examination of his extremities were normal. (Tr. 319)

When Plaintiff returned to Dr. Summers' office in April 2016, Plaintiff reported that he had stopped taking gabapentin "due to lack of effectiveness" and he "continue[d] to have problems with a burning and tingling sensation in both hands and feet." (Tr. 316) Dr. Summers prescribed Lyrica and ordered upper and lower extremity nerve conduction studies. (Id.) He

also noted that Plaintiff's last viral count was undetectable, his CD4 cell count was 322, and his creatinine level was 1.55. (Id.)

In July 2016, Plaintiff presented to Dr. Summers' office for his annual physical examination. (Tr. 292) Plaintiff reported "some mild problems with depression, despite being on medication," and denied fatigue, change in appetite, headaches, dizziness, abdominal pain, and nausea. (Tr. 292-93) Dr. Summers did not note any complaints about peripheral neuropathy. Plaintiff's last viral load was undetectable and his CD4 cell count was 343. (Tr. 293) Plaintiff continued to smoke. (Id.)

At Plaintiff's follow-up appointment in November 2016, Plaintiff stated he "continues to have neuropathy in his feet and he wishes that further evaluation [sic]. He does get benefit from Lyrica, but his insurance will not cover it." (Tr. 290) Dr. Summers provided Plaintiff samples of Lyrica and referred Plaintiff to BJC's neurology department for a nerve conduction test of the lower extremities.[5] (Tr. 289) Plaintiff denied fatigue, headaches, change in appetite, abdominal pain, and nausea. Plaintiff "admit[ted]" coughing and shortness of breath but "declined inhaler therapy." (Tr.289-90) Plaintiff's last viral load was undetectable, his CD4 cell count was 370, and his weight was 162.8 pounds. (Tr. 290)

Dr. Summers completed an HIV infection medical assessment form, or medical source statement (MSS), for Plaintiff in April 2017. (Tr. 326-33) On a checklist of "opportunistic and indicator diseases," Dr. Summers checked: "CANDIDIASIS at a site other than the skin, urinary tract, intestinal tract, or oral or vulvovaginal mucous membranes; or candidiasis involving the esophagus, trachea, bronchi, or lungs"; "PNEUMOCYSTIS CARINII PNEUMONIA OR

---

[5] The record contains no documentation reflecting that Plaintiff underwent either these nerve conduction studies or those ordered by Dr. Summers in April 2016.

EXTRAPULMONARY PNEUMOCYSTIS CARINII INFECTION"; and "NEPHROPATHY, resulting in chronic renal failure."[6] (Tr. 326-35)

In the MSS, Dr. Summers also noted that Plaintiff had "marked" restrictions of activities daily living and "marked" difficulties in maintaining social functioning and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (Tr. 330-31) In regard to Plaintiff's physical limitations, Dr. Summers opined that Plaintiff could: walk two city blocks without rest or severe pain; continuously sit more than two hours and stand for thirty minutes; sit a total of four hours and stand/walk a total of four hours in an eight-hour work day; frequently lift/carry 10 pounds, occasionally lift/carry 20 pounds, and rarely lift/carry fifty pounds. (Tr. 332) Additionally, Dr. Summers estimated that Plaintiff would require six thirty-minute unscheduled rest breaks in an average eight-hour workday. (Id.)

### III.  Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [Plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

---

[6] Dr. Summers did not check the box beside "OTHER NEUROLOGICAL MANIFESTATIONS OF HIV INFECTION (e.g. peripheral neuropathy), with significant and persistent disorganization of motor function in 2 extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." (See Tr. 329)

To determine whether a Plaintiff is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920.  Those steps require a Plaintiff to show that he or she:  (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work.  Id.

IV.     **The ALJ's Determination**

In a decision dated June 19, 2017, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920(a).  (Tr. 11-21)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since March 17, 2015, the application date; (2) had the severe impairments of HIV, peripheral neuropathy, chronic obstructive pulmonary disease (COPD), and depression; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 13)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 16)  The ALJ determined that Plaintiff retained the residual functional capacity (RFC), to perform light work as defined in 20 C.F.R. 416.967 (b) with the following limitations:

> [Plaintiff is] unable to climb ladders, ropes, or scaffolds and he can only occasionally climb ramps and stairs. He is further limited to frequent handling and fingering. He must avoid concentrated exposure to extreme heat, cold, dust, fumes, or other pulmonary irritants. Mentally, he is limited to performing simple routine tasks, not at a fast pace such as an assembly line, and that require only occasional interaction with co-workers and the public.

(Tr. 15)

In determining Plaintiff's RFC, the ALJ considered Plaintiff's treatment notes and MSS from Dr. Summers. (Tr. 16-18) The ALJ noted, in regard to Plaintiff's HIV status, that Plaintiff's "viral load has consistently been undetectable since he became compliant with medication and his CD4 count continued to rise." (Tr. 18) Plaintiff regularly denied fatigue, headaches, and side effects from his medications. (Id.) As to Plaintiff's peripheral neuropathy, the ALJ found that Plaintiff's complaints were "sporadic" and, even if the neuropathy was continuous, "the record lacks objective evidence to support the alleged severity since there is no indication the claimant underwent nerve conduction testing" and Plaintiff's "neuro examinations" were consistently normal. (Id.)

At steps four and five of the sequential evaluation, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy. (Tr. 20) Specifically, the ALJ found, based on the testimony of the vocational expert, that Plaintiff could perform the jobs of merchandise marker and collator operator. (Id.) The ALJ further stated that, even if Plaintiff's RFC was limited to "lifting/carrying 10 pounds frequently and less than 10 pounds occasionally, and standing/walking for only 2 hours of an 8-hour workday," there existed a significant number of jobs that he could perform. (Tr. 20-21) According to the ALJ, even with this more restricted RFC, Plaintiff could perform the jobs of addressing clerk and document preparer and, therefore, was not disabled. (Tr. 21)

## V. Discussion

Plaintiff claims the ALJ erred in: (1) discrediting Plaintiff's subjective complaints; (2) assigning too little weight to the treating physician's opinion; and (3) finding an RFC that was

not supported by substantial evidence.[7]  [ECF No. 23]  In response, Defendant asserts:  (1) the ALJ properly evaluated Plaintiff's subjective complaints; (2) the ALJ properly discounted the treating physician's more restrictive opinions; and (3) substantial evidence supported the RFC findings. [ECF No. 28]

### A.  Standard for Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence supporting a contrary outcome." Id. (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

A court does not "reweigh the evidence presented to ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a Court must affirm the ALJ's decision "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings." Cruze v. Charter, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)); Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

---

[7] For ease of analysis, the Court addresses Plaintiff's claims out of order.

B.  Subjective Complaints

Plaintiff claims that the ALJ's "credibility determination is flawed" because the ALJ relied too heavily on the third party report of Plaintiff's then girlfriend, Lois Hudson, describing Plaintiff's activities of daily living.[8]  [ECF No. 23]  More specifically, Plaintiff argues that Ms. Hudson completed the third party report nearly two years prior to the administrative hearing and the activities of daily living that Ms. Hudson described were not inconsistent with his allegations of disability.  [Id.]  Defendant counters that the ALJ properly considered Ms. Hudson's report along with the entire record when evaluating the credibility of his subjective complaints.  [ECF No. 28]

For purposes of Social Security analysis, a "symptom" is an individual's own description or statement of his physical or mental impairments(s). SSR 16-3p, 2017 WL 5180304, at *2 (SSA. Oct. 2017). If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8. See also 20 C.F.R. § 404.1529(c)(3) (explaining how the SSA evaluates symptoms, including pain).

When evaluating a claimant's subjective statements about symptoms, the ALJ must "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ

_____

[8] Many Social Security regulations were amended effective March 27, 2017.  Per 20 C.F.R. §§ 404.614, 404.1527, 416.325, 416.927, the court will use the regulations in effect at the time that this claim was filed.

explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also SSR 16-3p, 2017 WL 5180304, at *11.

Here, the ALJ did not rely solely on Ms. Hudson's report to find Plaintiff's subjective complaints not credible. Rather, the ALJ thoroughly reviewed the objective medical evidence, treatment records, and medical opinion evidence. (Tr. 16) In her decision, the ALJ identified a number of reasons for finding Plaintiff's statements concerning the intensity, persistence, and limiting effective of his symptoms to be no entirely credible. In particular, the ALJ noted that Plaintiff's medical records reflected "continued improvement in the claimant's condition with 100 percent medication compliance." (Tr. 17) Plaintiff's medical records reflected that Plaintiff's viral load had remained undetectable since July 2015 and his CD4 cell count increased at each appointment. Additionally, since beginning treatment with Dr. Summers, Plaintiff's weight had increased by approximately forty pounds. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Lawson v. Colvin, 807 F.3d 962, 965 (8th Cir. 2015) (quoting Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010)).

The ALJ also considered Dr. Summers' treatment notes, which did not reflect consistent complaints of fatigue. To the contrary, Plaintiff regularly denied fatigue from November 2014 through November 2016. Plaintiff also regularly denied dizziness and headaches, symptoms about which he complained at the administrative hearing. The fact that Plaintiff did not complain to Dr. Summers about these symptoms casts doubt on his claim that they were disabling.

In regard to Plaintiff's complaints of neuropathy, the ALJ noted that they were "sporadic since he did not report them at every regular visit to Dr. Summers." (Tr. 18) The ALJ also

deemed it significant that Plaintiff did not appear to undergo the nerve conduction testing ordered by Dr. Summers. "While not dispositive, a failure to seek treatment may indicate the relative seriousness of the medical problem." Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

Along with Plaintiff's medical records, the ALJ considered Plaintiff's testimony and self-reported daily activities. Generally, "a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000). Thus, a person does not have to be "bedridden or completely helpless to be found disabled." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)). However, an ALJ may discount a claimant's subjective complaints of disabling impairment if they are inconsistent with his activities of daily living. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013); Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010).

The ALJ assigned "significant weight" to Ms. Hudson's third-party function report, which stated that, in June 2015, Plaintiff cooked, cleaned, shopped, did laundry, walked, and used public transportation, and his hobbies included taking long walks. As Plaintiff admits in his brief, "Ms. Hudson's report is not inconsistent with Plaintiff's function report and allegations of disability." [ECF No. 23 at 9] Plaintiff's function report similarly showed that Plaintiff "had no problem with personal care," prepared his own meals, shopped, used public transportation, and did laundry. (Tr. 196) At the hearing in May 2017, Plaintiff likewise testified that he was able to dress himself, tie his shoes, and put on a belt and, when he had housing, he could take out the trash, prepare meals and do laundry. The ALJ did not err in finding that Plaintiff's ability to

perform daily activities undermined his allegations of disabling symptoms.  See, e.g., Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

The Court finds the ALJ considered Plaintiff's subjective complaints on the basis of the entire record and set out a number of inconsistencies that detracted from the credibility of his allegations of disabling pain.  Because the ALJ's determination not to credit Plaintiff's subjective complaints was supported by "good reasons and substantial evidence," the Court defers to his determination. See Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006).

C.  Treating Physician's Opinion

Plaintiff claims the ALJ erred in assigning Dr. Summers' MSS only "some weight." (ECF No. 23 at 4-7)  Plaintiff further argues, because the ALJ discounted Dr. Summers' more limiting restrictions, there was not substantial medical evidence supporting the RFC determination.  Defendant counters that the ALJ properly discounted Dr. Summers' more restrictive opinions because they were inconsistent with his treatment notes and unsupported by the record as a whole.  [ECF No. 28 at 9-13]

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh, 222 F.3d at 452.  Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Id.  This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians.  See 20 C.F.R. §§ 404.1527, 416.927; Thomas, 928 F.2d at 259 n.3.

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d at 921 (quoting 20 C.F.R. § 404.1527(d)(2)).

In his MSS, Dr. Summers opined that Plaintiff could sit for more than two hours at a time for a total of four hours per day, and stand only thirty minutes at a time for a total of four hours per day. Dr. Summers estimated that Plaintiff would require six thirty-minute unscheduled breaks per day. Dr. Summers also noted that Plaintiff was able to lift and carry less than ten pounds frequently and twenty pounds occasionally. Nowhere in his opinion did Dr. Summers state that Plaintiff's impairments affected the use of his hands.

The ALJ reviewed Dr. Summers' MSS and assigned it "some weight…in terms of the physical limitations." (Tr. 19) In regard to the sitting and standing limitations and need for breaks, the ALJ found that Dr. Summer's "own progress notes do not support this level of fatigue." (Id.) The ALJ explained: "With medication compliance, the claimant's viral load was usually within appropriate limits and the records do not include documented complaints of symptoms that would preclude light or sedentary work, even considering the peripheral neuropathy that the notes characterize as mild." (Id.). Additionally, the ALJ noted that "[l]ab testing does not support ongoing symptoms from chronic renal failure." (Id.) However, the ALJ accepted Dr. Summers' lifting and carrying restrictions. (Id.)

The ALJ assigned Dr. Summers' opinion limited weight because his treatment records did not document any subjective reports of the limitations he included in the MSS or any objective findings to corroborate them. "An ALJ need not giving controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment." Barnes v. Berryhill, 1:16-CV-155-JAR, 2017 WL 4236933, at *5 (E.D. Mo. Sept. 25, 2017) (quoting Wiley v. Colvin, No. 1:13-CV-1118-SNLJ-TIA, 2014 WL 4261113, at *11 (E.D. Mo. Aug. 29, 2014)).

Dr. Summers treated Plaintiff approximately every three months for over two years. As discussed above, Dr. Summers' treatment notes reflected that Plaintiff's impairments improved with treatment. Plaintiff began treatment for HIV in August 2014 and, by July 2015, his viral load was undetectable. In January 2016, Dr. Summers was able to discontinue Plaintiff's Bactrim because his CD4 count was "persistently elevated." Additionally, Dr. Summers records reflected that Plaintiff's weight increased from 122.4 pounds in August 2014 to 162.8 pounds in November 2016, suggesting an improvement in his appetite.

Plaintiff's peripheral neuropathy also appeared to improve with treatment. Plaintiff first complained of neuropathy in April 2015. Dr. Summers prescribed gabapentin and, at Plaintiff's next appointment in July 2015, Plaintiff reported that the gabapentin "helped slightly." Dr. Summers increased Plaintiff's dosage, and Plaintiff did not report neuropathy again until April 2016. At that time, Dr. Summers switched Plaintiff from gabapentin to Lyrica. Dr. Summers did not note peripheral neuropathy at Plaintiff's July 2016 appointment and, in November 2016, Plaintiff's complaints were limited to his feet. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Wildman, 596 F.3d at 965 (citation omitted).

Additionally, Dr. Summers' treatment notes reflected that Plaintiff did not consistently complain of fatigue or peripheral neuropathy. Although Plaintiff testified to serious fatigue at his hearing, Dr. Summers' medical notes reflect that Plaintiff last reported fatigue in September 2014. Likewise, Dr. Summers noted complaints of neuropathy at only four of Plaintiff's eleven appointments. As the ALJ pointed out in her decision, Dr. Summers' examinations of Plaintiff's extremities and neurology consistently yielded normal findings. Lack of evidence that a claimant complained to his physicians about the allegedly disabling symptoms undermines the credibility of those allegations. Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (citing Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004)).

Despite Dr. Summers' opinion that Plaintiff could sit for only four hours per workday and stand or walk only four hours per workday, his treatment notes did not reflect symptoms of such severity that would preclude Plaintiff from performing any work. Furthermore, Dr. Summers' limitations were inconsistent with Plaintiff's reported activities of daily living, which included long walks, chess, cleaning, preparing meals, and using public transportation.

Plaintiff contends that, because the ALJ discredited Dr. Summers' MSS, the RFC determination was not supported by some medical evidence. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). However, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (internal citations omitted). In other words, the ALJ uses medical sources to "provide evidence" about

several factors, including RFC, but the "final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 416.927(d)(2).

Plaintiff suggests that the ALJ "should have obtained medical evidence if he did not believe Dr. Summers' opinion." [ECF No. 23 at 3] However, "[a]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Swink v. Saul, 931 F.3d 765, 770 (8th Cir. 2019) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). For the reasons stated above, the evidence in the record provided a sufficient basis for the ALJ's decision such that the ALJ was not required to order a consultative examination.

The Court notes that, even though there is some evidence in the record that contradicts the ALJ's findings, "it is not the function of a reviewing court to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings." Adkins v. Comm'r, Soc. Sec. Admin., 911 F.3d 547, 550 (8th Cir. 2018). Rather, "[t]he test is whether there is substantial evidence on the record as a whole which supports the decision of the ALJ." Id. Here, the ALJ appropriately discounted Dr. Summers' MSS opinions because there was significant inconsistency between the limitations in the MSS and his own contemporaneous treatment records.

### D. RFC

Plaintiff argues that the ALJ's RFC determination "is conclusory and is not supported by the evidence." [ECF No. 23 at 2] In particular, Plaintiff claims the RFC fails to account for the impairment in his feet and provided no rationale for only limiting fingering and handling to frequently. Defendant counters that substantial evidence supported the ALJ's RFC determination. [ECF No. 28]

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1).  See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley, 829 F.3d at 932 (quoting Cox, 495 F.3d at 619).  "However, there is no requirement that an RFC finding be supported by a specific medical opinion."  Id.  Furthermore, "in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."  Cox, 495 F.3d at 619.  The claimant bears the burden of proving disability and demonstrating his or her RFC.  Martise, 641 F.3d at 923.

In this case, the ALJ thoroughly reviewed Plaintiff's medical records, opinion evidence, and testimony in formulating his RFC.  As discussed above, the ALJ found that Plaintiff had the severe impairment of peripheral neuropathy.  Nevertheless, the ALJ determined that Plaintiff had the RFC to perform light work "except that he is unable to climb ladders, ropes, or scaffolds and he can only occasionally climb ramps and stairs," he is "limited to frequent handling and fingering," and he must avoid concentrated exposure to certain environmental conditions and irritants.  (Tr. 15)

As an initial matter, the Court finds that the ALJ did not err in failing to assess Plaintiff's RFC on a function-by-function basis.  See, e.g., Benson v. Colvin, 4:14-CV-0422-DGK-SSA, 2015 WL 4610988, at *4 (W.D. Mo. July 31, 2015).  The ALJ thoroughly reviewed the

testimony and medical records, identified Plaintiff's severe impairments, and explained his limitations in detail. See McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011) ("We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation.").

Plaintiff argues that the medical evidence did not support the ALJ's findings that he could use his hands and fingers frequently. However, as previously discussed, Plaintiff's medical records reflected that his peripheral neuropathy improved with treatment. In fact, Plaintiff's last complaint of upper extremity neuropathy appeared in Dr. Summers' notes from April 2016, when Dr. Summers prescribed Lyrica. Plaintiff did not complain of neuropathy at his July 2016 appointment and, in November 2016, when Plaintiff had stopped taking Lyrica, Plaintiff's complaints of neuropathy were limited to his feet. Although Dr. Summers ordered nerve conduction studies for Plaintiff's upper and lower extremities, the record contains no documentation that Plaintiff underwent that testing. Notably, Dr. Summers did not include handling or fingering limitations in the April 2017 MSS. The ALJ adequately accounted for Plaintiff's upper extremity peripheral neuropathy by limiting him to frequent fingering and handling. Plaintiff's medical records did not suggest the need for greater restrictions on the use of his hands.

Plaintiff also asserts that substantial evidence supported greater restrictions on his ability to stand and walk. However, the only reference to Plaintiff's ability to stand or walk appeared in Dr. Summers' MSS. In his two years regularly treating Plaintiff, Dr. Summers did not document Plaintiff's alleged difficulty walking and standing. As discussed above, Dr. Summers' treatment notes did not support the restrictions he included in the MSS, much less the greater restrictions Plaintiff claims in this appeal.

Furthermore, despite finding Plaintiff capable of performing light work, the ALJ left open the possibility that Plaintiff might require more sedentary work. The ALJ found that, even if Plaintiff were limited to " lifting/carrying 10 pounds frequently and less than 10 pounds occasionally, and standing/walking for only 2 hours of an 8-hour workday," there existed in the national economy a significant number of jobs that Plaintiff could perform, including addressing clerk and document preparer. (Tr. 21) Based on the foregoing, the Court concludes that the record contained substantial evidence to support the ALJ's RFC assessment, and the ALJ did not err in finding that Plaintiff was not disabled.

## VI. *Conclusion*

For the reasons set forth above, the Court finds that the decision of the Commissioner is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of August, 2019